James E. Cecchi (NJ Bar No. 030861989)
Lindsey H. Taylor (NJ Bar No. 016781986)
CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700
Attorneys for Plaintiffs

| | |
|---|---|
| JILL ALBAN, GRANT ALBAN, MARY ARNOLD, AL BAKER, KATRINA BONAR, STEVEN BRUZONSKY, MONICA BUSHEY, MELINDA DENEAU, JENNIFER DILLON, JEFFREY L. GANNON, PAMELA GOESSLING, THOMAS GOESSLING, SHERYL HALEY, LESLEY DENISE HART, BRUCE HERTZ, MARIA KOOKEN, ADAIR LARA, KORI LEHRKAMP, MICHAEL LEHRKAMP, JOHN LEVYA, DANIEL MORRIS, JUDY A. REIBER, RICHARD TOMASKO, JOHN O'NEILL JOHNSON TOYOTA, RUSH TRUCK CENTERS OF ARIZONA, INC., *on behalf of themselves and all others similarly situated,* | SUPERIOR COURT OF NEW JERSEY MERCER COUNTY: LAW DIVISION DOCKET No. MER L 000431-21 |
| Plaintiffs, | |
| v. | **FIRST AMENDED COMPLAINT and DEMAND FOR JURY TRIAL** |
| KAWASAKI KISEN KAISHA, LTD., "K" LINE AMERICA, INC., AND THEIR AFFILIATES, | |
| Defendants | |

Plaintiffs Jill Alban, Grant Alban, Mary Arnold, Al Baker, Katrina Bonar, Steven Bruzonsky,

Monica Bushey, Melinda Deneau, Jennifer Dillon, Jeffrey L. Gannon, Pamela Goessling, Thomas

Goessling, Sheryl Haley, Lesley Denise Hart, Bruce Hertz, Maria Kooken, Adair Lara, Kori

Lehrkamp, Michael Lehrkamp, John Levya, Daniel Morris, Judy Reiber, Richard Tomasko, John

O'Neill Johnson Toyota, LLP, and Rush Truck Centers of Arizona, Inc. (collectively "Plaintiffs"),

on behalf of themselves and all others similarly situated, by way of Complaint against Defendants

Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., and their affiliates, allege as follows:

## INTRODUCTION

1. This case arises from Defendants' breach of their clear and unambiguous settlement agreement with Plaintiffs.

2. This agreement followed Defendants' participation in a global conspiracy to fix, raise, maintain, and stabilize prices and to allocate the market and customers for "Vehicle Carrier Services."[1] To obtain relief and hold the conspirators accountable for the harm caused by their scheme, Plaintiffs filed class actions under state and federal antitrust law (the "Antitrust Action").

3. While a motion to dismiss was pending in the Antitrust Action, the parties (Plaintiffs and Defendants) agreed to a settlement and memorialized their agreement in a signed Memorandum of Understanding (the "MOU"), which they executed on July 23, 2015 in Newark, New Jersey.[2] In the MOU, Defendants agreed to pay to the members of the proposed class a substantial sum of money in exchange for the release of "claims [they] have asserted or may have asserted related to the sale of Vehicle Carrier Services."

4. The MOU declared that it was a "binding agreement" to be "effective . . . regardless of . . . events materially adverse to [P]laintiffs, K Line, or any of the other parties."

5. Through this agreed-upon language, the parties made the MOU effective on July 23, 2015, and ensured that Defendants' obligation to pay persisted irrespective of any subsequent

---

[1]      Vehicle carriers transport large numbers of cars, trucks, and other automotive vehicles, including agriculture and construction equipment, across large bodies of water using specialized cargo ships known as Roll On/Roll Off vessels ("RoRos"). "Vehicle Carrier Services" refers to the paid ocean transportation of new, assembled motor vehicles by RoRo.

[2]      Attached as Exhibit A with the settlement amount redacted.

occurrence, including a grant of Defendants' motion to dismiss for lack of jurisdiction—a motion that had been pending for over seven months when the parties executed the MOU.

6.      The MOU further declared that "in the event the court grants [D]efendants' collective motion to dismiss" Plaintiffs' antitrust claims, the only provision that would become nonbinding was a settlement provision reducing (under certain circumstances not applicable here) the amount Defendants would owe to the members of the proposed class.

7.      Despite the parties' clear intent to create a binding agreement that would survive dismissal of the Antitrust Action or any adverse event to Plaintiffs, Defendants refused to honor their obligations under the MOU after the court hearing the Antitrust Action granted the motion to dismiss.

8.      Because Defendants breached the MOU, Plaintiffs and the other members of the proposed class have suffered and will continue to suffer substantial injuries. For themselves and on behalf of the members of the proposed class, Plaintiffs seek a judgment requiring Defendants to honor their contractual obligations and pay what they owe.

## PARTIES

### I.      Plaintiffs

9.      Jill Alban is a Montana resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Alban was one of the plaintiffs who entered into the MOU, which Defendants breached.

10.     Grant Alban is a Montana resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Alban was one of the plaintiffs who entered into the MOU, which Defendants breached.

11.     Plaintiff Mary Arnold is a Tennessee resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Arnold was one of the plaintiffs who entered into the MOU, which Defendants breached.

12.     Plaintiff Al Baker is a North Dakota resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Baker was one of the plaintiffs who entered into the MOU, which Defendants breached.

13.     Plaintiff Katrina Bonar is a West Virginia resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Bonar was one of the plaintiffs who entered into the MOU, which Defendants breached.

14.     Plaintiff Steven Bruzonsky is an Arizona resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Bruzonsky was one of the plaintiffs who entered into the MOU, which Defendants breached.

15.     Plaintiff Monica Bushey is a Maine resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Bushey was one of the plaintiffs who entered into the MOU, which Defendants breached.

16.     Melinda Deneau is a New Hampshire resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Deneau was one of the plaintiffs who entered into the MOU, which Defendants breached

17.     Plaintiff Jennifer Dillon is a Michigan resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Dillon was one of the plaintiffs who entered into the MOU, which Defendants breached.

18.     Plaintiff Jeffrey L. Gannon is a Kansas resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Gannon was one of the plaintiffs who entered into the MOU, which Defendants breached.

19.     Plaintiff Pamela Goessling is a Missouri resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Goessling was one of the plaintiffs who entered into the MOU, which Defendants breached.

20.     Plaintiff Thomas Goessling is a Missouri resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Goessling was one of the plaintiffs who entered into the MOU, which Defendants breached.

21.     Plaintiff Sheryl Haley is a Utah resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Haley was one of the plaintiffs who entered into the MOU, which Defendants breached.

22.     Plaintiff Lesley Denise Hart is a South Carolina resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Hart was one of the plaintiffs that entered into the binding settlement agreement with Defendants, which Defendants breached.

23.     Plaintiff Bruce Hertz is a Florida resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Hertz was one of the plaintiffs who entered into the MOU, which Defendants breached.

24.     Plaintiff Maria Kooken is a Nebraska resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Kooken was one of the plaintiffs who entered into the MOU, which Defendants breached.

25.     Plaintiff Adair Lara is a California resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Lara was one of the plaintiffs who entered into the MOU, which Defendants breached.

26.     Plaintiff Kori Lehrkamp is a South Dakota resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Lehrkamp was one of the plaintiffs who entered into the MOU, which Defendants breached.

27.     Plaintiff Michael Lehrkamp is a South Dakota resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Lehrkamp was one of the plaintiffs who entered into the MOU, which Defendants breached.

28.     Plaintiff John Levya is a Nevada resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Levya was one of the plaintiffs who entered into the MOU, which Defendants breached.

29.     Plaintiff Daniel Morris is an Oregon resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Morris was one of the plaintiffs who entered into the MOU, which Defendants breached.

30.     Plaintiff Judy A. Reiber is a Minnesota resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Reiber was one of the plaintiffs who entered into the MOU, which Defendants breached.

31.     Plaintiff Richard Tomasko is a Vermont resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Tomasko was one of the plaintiffs who entered into the MOU, which Defendants breached

32.     Plaintiff John O'Neill Johnson Toyota ("Johnson Toyota") is a Mississippi limited liability company with its principal place of business in Meridian, Mississippi. Johnson Toyota is

6

an authorized Toyota dealer that bought Toyota-brand vehicles shipped via RoRo by one or more of the Defendants or their co-conspirators from the vehicles' country of origin to the United States. Johnson Toyota was one of the plaintiffs who entered into the MOU, which Defendants breached.

33.    Plaintiff Rush Truck Centers of Arizona ("Rush AZ") is a Delaware corporation with its principal place of business in Arizona. Rush AZ is an authorized Peterbilt and Hino Ford dealer that bought vehicles that were shipped via RoRo by one or more of the Defendants or their co-conspirators from the vehicles' country of origin to the United States. Rush AZ was one of the plaintiffs who entered into the MOU, which Defendants breached.

34.    Counsel for Plaintiffs signed the MOU in Newark, New Jersey.[3]

## II.    Defendants

35.    Defendant Kawasaki Kisen Kaisha, Ltd. ("K Line") is a Japanese company with its principal place of business at 1-1, Uchisaiwaicho 2-chome, Chiyoda-ku, Tokyo 100-8540. K Line's subsidiaries act as its agents in the United States. K Line—directly and/or through its subsidiaries, which it wholly owned and/or controlled—shipped new, assembled motor vehicles to and from the United States. K Line—directly and/or through its subsidiaries, which it wholly owned and/or controlled—provided, marketed, and/or sold Vehicle Carrier Services throughout the United States. K Line facilitated and/or implemented the secret agreement and/or agreements among the conspirators. K Line was a party to the MOU and repudiated it. K Line signed the MOU in Newark, New Jersey.

---

[3] Plaintiffs have amended their complaint as of right to clarify that the MOUs were signed in Newark, New Jersey. Both Plaintiffs and Defendants were previously under the impression that the MOUs were signed in Trenton; in fact, both parties submitted to a federal court in the Eastern District of Virginia that the MOUs were signed in Trenton. Having subsequently conferred, the parties realized their previous mutual mistake. In conjunction with this amended complaint, Plaintiffs have filed a motion seeking to transfer venue of this action to Superior Court of New Jersey sitting in Essex County.

36.     Defendant "K" Line America, Inc. ("K Line America"), a Michigan corporation, is a wholly owned subsidiary of K Line.  Its principal place of business is 4860 Cox Road, Suite 300, Glen Allen, Virginia 23060. It acts as K Line's agent in the United States.  At all relevant times, its activities in the United States were under the control and direction of K Line, which controlled its policies, sales, and finances. K Line America shipped new, assembled motor vehicles to and from the United States.  K Line America also provided, marketed, and/or sold Vehicle Carrier Services throughout the United States. K Line America facilitated and/or implemented the secret agreement and/or agreements among the conspirators. K Line America was a party to the MOU and repudiated it. K Line America signed the MOU in Newark, New Jersey.

## JURISDICTION AND VENUE

37.     This Court has personal jurisdiction over Defendants because the contract at issue was negotiated, signed, and executed in Newark, New Jersey. Therefore, Defendants have purposefully availed themselves of the privilege of conducting activities within New Jersey, thus invoking the benefits and protections of this state's laws. This Court's exercise of jurisdiction over Defendants is consistent with due process.

38.     Venue is proper in this Court under Rule 4:3-2 of the New Jersey Rules of Court for the Superior Courts because relevant conduct regarding the contract at issue, including its negotiation and execution, took place in Newark, New Jersey.

## FACTUAL ALLEGATIONS

**A.     Defendants engaged in a sweeping conspiracy to injure American consumers, resulting in Defendants admitting their guilt and paying hundreds of millions of dollars in fines.**

39.     This breach of contract action arises out of a massive, international conspiracy to fix prices, allocate customers, and restrict capacity for Vehicle Carrier Services. The conspiracy

caused Plaintiffs to pay higher prices for cars and trucks shipped to the United States than they would have in a competitive market for Vehicle Carrier Services.

40.     The conspiracy in which Defendants engaged was not loosely defined or speculative. On the contrary, Defendants pleaded guilty to violating federal law and admitted that they "participated in a conspiracy among ocean carriers of roll-on, roll-off cargo, the primary purpose of which was to suppress and eliminate competition by allocating customers and routes, rigging bids, and fixing prices for international ocean shipping services . . . in violation of the Sherman Antitrust Act, 15 U.S.C. § 1." The United States Department of Justice, the Japanese Fair Trade Commission, and the European Commission have fined Defendants and their co-conspirators hundreds of millions of dollars for fixing prices for Vehicle Carrier Services. Around the world, Defendants and their co-conspirators have paid well over $500 million to various regulatory and law enforcement bodies.

41.     Neither Defendants nor any of their co-conspirators have paid a single dollar to Plaintiffs in this action or to any other American consumer or business injured by their unlawful conduct.

42.     Plaintiffs filed class actions on behalf of various indirect purchasers of Vehicle Carrier Services for damages and injunctive relief under federal and state antitrust statutes. On October 8, 2013, the Judicial Panel on Multi-District Litigation transferred related actions to the District of New Jersey for consolidated pretrial proceedings.

43.     Following consolidation, Defendants and their co-conspirators filed a collective motion to dismiss the Antitrust Action.

9

**B.      Defendants chose to settle and executed the MOU.**

44.      After months of negotiation, Plaintiffs and Defendants entered into an MOU to settle the Antitrust Action. The MOU was effective July 23, 2015.[4]

45.      Faced with substantial evidence of their misconduct, including a guilty plea from the "team leader and general manager in K Line's car carrier division," Defendants determined that settlement was a strategic choice that would manage their risk by eliminating the possibility of monetary liability of a magnitude far exceeding than the settlement amount.

46.      Defendants agreed to provide members of the proposed class with monetary compensation. In exchange, Plaintiffs and the members of the proposed class agreed to release Defendants "from claims they have asserted or may have asserted related to the sale of Vehicle Carrier Services."

47.      The MOU required Defendants to place the settlement funds in escrow within 30 days of the effective date, that is, by August 22, 2015. Effective August 20, 2015, Plaintiffs and Defendants amended the MOU to grant Defendants an "additional ten (10) business days to complete the deposit of the Settlement Amount following the date on which the Indirect Purchaser Plaintiffs[5] provide counsel for K Line with the necessary escrow account information."[6]

48.      Plaintiffs have provided Defendants with sufficient wiring and bank transfer information to effectuate transfer of the settlement amount. More than ten business days have passed since Defendants' receipt of such information.

---

[4]  The MOU declared that counsel signing the MOU on Defendants' behalf were "duly authorized to execute this MOU and make it binding" upon Defendants.

[5] The Indirect Purchaser Plaintiffs referenced in the MOU are the same as the members of the class proposed in this complaint.

[6] The amendment to the MOU with the settlement amount redacted is attached as Exhibit B.

**C.     The parties drafted the MOU to ensure that Defendants' obligation to pay remained binding even if they prevailed on their pending motion to dismiss.**

49.     When the parties executed the MOU on July 23, 2015, Defendants had already filed a motion to dismiss Plaintiffs' claims for lack of federal subject matter jurisdiction. At that point, the motion had been pending for over seven months.

50.     Both Plaintiffs and Defendants faced risk: Plaintiffs faced the risk that their claim would be dismissed for want of jurisdiction; Defendants faced the risk that their motion would be denied, subjecting them to an increased risk of substantial liability following an adverse trial verdict. The need to resolve this uncertainty was central to the parties' decision to settle and to Plaintiffs' willingness to accept a discounted recovery.

51.     To avoid precisely the situation that resulted in the present suit—a refusal to pay— the MOU included provisions that accounted for the possibility that Defendants' motion would be granted. These provisions ensured that dismissal would not and did not excuse Defendants' obligation to pay the promised settlement amount to the members of the proposed class.

52.     Paragraph 10 of the MOU provided, in pertinent part:

[T]he parties intend this MOU to be a binding agreement effective as of [July 27, 2015] regardless of whether the long-form settlement agreement is ever executed and regardless of the occurrence of any decisions, developments or events materially adverse to plaintiffs . . . .

53.     Paragraph 10 unambiguously provides that Defendants' obligation to pay to Plaintiffs the settlement amount persists "regardless of the occurrence of any decisions, developments or events materially adverse to [P]laintiffs." The granting of Defendants' motion to dismiss the Antitrust Action is certainly a "decision" or "development" that was "materially adverse to [P]lainitffs."

54.    This provision reflects an unremarkable principle common to settlement agreements in complex, multiparty cases. Because litigation always involves the risk that future developments might increase or decrease parties' likelihood of success and their potential liability (or for plaintiffs, recovery), parties settle on terms to manage that risk. Defendants made the choice to reduce their risk to certainty—the certainty that they would not be liable to Plaintiffs for more than the settlement amount. For their part, Plaintiffs accepted a discounted amount for the certainty of payment.

55.    Paragraph 11 eliminates all possible doubt that dismissal of the Antitrust Action for lack of federal subject matter jurisdiction excused Defendants' obligation to pay. That paragraph involved a "Most Favored Nation Clause," a common provision in agreements with early-settling defendants, such as Defendants here. The paragraph provided:

> The parties further agree that the long-form settlement agreement shall contain a clause providing for the reduction of the Settlement Amount in the event the Indirect Purchaser Plaintiffs settle with any other defendants on more favorable monetary terms as measured by the agreed respective market shares. . . . [T]he clause shall cease to be binding in the event the court grants defendants' collective motion to dismiss the Indirect Purchaser Plaintiffs['] complaints, denies class certification, or grants summary judgment in favor of defendants resolving the plaintiffs' damages claims in their entirety in favor of defendants, and none of Indirect Purchaser Plaintiffs prevail on appeal of the relevant motion.

56.    Under this provision, Plaintiffs' future settlements with other vehicle carrier defendants might have reduced the amount that Defendants would owe. However, there would be no reduction if (as happened), the Antitrust Action were to be dismissed. By means of this provision, the parties agreed that even if dismissal of the Antitrust Action reduced the liability of other vehicle carriers to zero, Defendants' liability would remain fixed at the amount agreed to in the MOU.

57.     This paragraph demonstrates that the parties knew how to specify the effect of a dismissal of the Antitrust Action on their obligations under the MOU. By singling out a particular contractual provision that would become inoperative in the event of a dismissal of the Antitrust Action, the MOU confirmed the parties' mutual understanding that Defendants' other obligations would survive dismissal.

58.     Under the law, every provision of a contract must be given effect. The MOU declares that a specific provision to be included in a future long-form settlement—dealing with a "motion-favored nation" clause common to class settlements—would become nonbinding if the motion to dismiss were to be granted. If a grant of the motion to dismiss the Antitrust Action terminated the entire settlement agreement, as K Line contends, then this provision would become superfluous. There is no need for a provision specifying that a grant of the motion to dismiss would render a specific provision nonbinding if dismissal rendered the entire MOU nonbinding.

59.     Any reading of the MOU that excuses Defendants from payment following dismissal of the Antitrust Action also defies common sense. No plaintiff would settle at a discount if prevailing on a pending motion to dismiss would let a defendant walk away from the settlement. Defendants cannot avoid their obligations because hindsight shows that rolling the dice on the motion to dismiss would have been more favorable.

60.     Here, Defendants, who are not strangers to litigation and represented by competent counsel, cannot feign surprise that a situation would occur where they settled the matter and then subsequently prevailed on their motion to dismiss: On the very same day that Defendants agreed to these provisions, the District of New Jersey heard oral argument on the motion to dismiss. Thus, when they executed the MOU, Defendants knew that they might prevail. Nevertheless, they consciously chose to settle for a sum certain in a binding agreement.

61.     Defendants' choice reveals their intent, effectuated through the language of the MOU and derived from standard principles of contract law.

62.     This intent reflects the commonsensical understanding of all participants in early settlements of complex litigation and now requires Defendants to fulfill their obligations and pay the settlement amount agreed to in the MOU to Plaintiffs and the members of the proposed class.

63.     At bottom, Defendants' attempt to wriggle out of their promise ignores the express language of the MOU, the intent of the parties, the law of contract, and basic common sense.

**D.    Although they initially acknowledged their contractual commitments, Defendants ultimately refused to honor them.**

64.     On August 28, 2015, the District of New Jersey granted Defendants' motion and dismissed the Antitrust Action for lack of federal subject matter jurisdiction.

65.     Following the district court's decision on their motion to dismiss, Defendants **continued to negotiate** for months with Plaintiffs over the content of the long-form settlement and escrow agreements, thus confirming their understanding that their duty to pay the agreed-upon monies remained binding despite the district court's dismissal.

66.     Counsel for both parties circulated multiple redlines of the agreements. For instance, on September 10, 2015, counsel for Defendants stated via e-mail to counsel for Plaintiffs, "The escrow agreement changes are ok with me." Similarly, on April 9, 2016, counsel for Defendants sent Plaintiffs' counsel clean and redlined versions of the long-form settlement and escrow agreements.

67.     Defendants' apparent willingness to uphold their bargain was unremarkable, because Paragraphs 10 and 11 of the MOU had made clear that Defendants' obligation to pay the settlement amount persisted despite the grant of the motion to dismiss. Their conduct eliminates

any doubt that their duty to pay not only survived dismissal but also survives to this day. Their prior conduct exposes the lack of merit in their current refusal to pay.

68.   Despite their initial acceptance of the continuing nature of their obligations, Defendants abruptly halted their participation in the process envisioned in the MOU.

69.   In February 2017, Plaintiffs notified Defendants of their duty to fulfill their obligations under the MOU and asked them to confirm their bargained-for promise. They refused to honor that promise, taking the position (contrary to the MOU's clear language) that failure to obtain appellate reversal of the district court's dismissal would terminate the agreement.

70.   Defendants have never paid any of the settlement funds despite the unambiguous requirement to which they assented when executing the MOU.

71.   By failing to pay the sums due under the MOU, Defendants breached their contract with Plaintiffs. Alternately, by stating that they would refuse to honor their obligations under the MOU, Defendants committed an anticipatory breach of their contract with Plaintiffs.

72.   On May 13, 2020, Plaintiffs brought a breach-of-contract class action in the Eastern District of Virginia. In light of certain subject matter jurisdiction concerns raised by that court at oral argument, Plaintiffs voluntarily dismissed their action on January 7, 2021. The dismissal was without prejudice.

**E.   The MOU does not excuse Defendants' refusal to pay the settlement amount.**

73.   Defendants' assertion that dismissal of the Antitrust Action extinguished Defendants' obligation to pay cannot be squared with a proper and straightforward interpretation of the MOU. Defendants cannot escape their obligations by invoking Paragraph 7(d) of the MOU, which describes the rare occurrence when a court rejects a class action settlement: when a "court rejects the Settlement, the funds remaining in any escrow account shall revert to K Line."

15

74.     This unremarkable provision reflects the requirement of Rule 23(e) of the Federal Rules of Civil Procedure that a court protect the interests of unnamed class members by approving a class action settlement only after determining that it is fair, reasonable, and adequate.

75.     The parties intended the term "reject" to describe a judicial determination that the proposed settlement was unfair, unreasonable, or inadequate. Thus, Paragraph 7(d) provided that Defendants would get their money back only if—and only if—all of the following occurred: (a) Defendants fulfilled their duty to pay the agreed-upon monies and deposited the funds in escrow; (b) the parties sought approval of the settlement; (c) the court rejected the settlement; and (d) Plaintiffs pressed forward with their claims.

76.     Under standard principles of contract interpretation, the meaning of a provision is not determined in isolation but rather in light of the other provisions of the contract. Hence, Paragraph 7(d) must be read together with Paragraph 10, which requires compliance "regardless of whether the long-form settlement agreement is ever executed and regardless of the occurrence of any decisions, developments or events materially adverse to plaintiffs." Because this provision ensured that Defendants' obligation to pay the settlement amount would survive dismissal of the Antitrust Action, expanding the meaning of "reject" in Paragraph 7(d) to include dismissal on jurisdictional grounds would violate this canon of interpretation.

77.     Paragraph 7(d) is thus inapplicable because the district court **did not reject** the settlement. The District of New Jersey never evaluated the fairness, reasonableness, or adequacy of the settlement under Rule 23(e). Instead, the court merely dismissed Plaintiffs' claims because, as a federal district court, it lacked the statutory authority to entertain them.

## CLASS ACTION ALLEGATIONS

78.     Plaintiffs seek all available legal and equitable relief under Rule 4:32-1(a), (b)(2),

and (b)(3) for themselves and on behalf of the following proposed class:

> All persons and entities in the United States in the End-Payor, the Truck and
> Equipment Dealer, and the Automobile Dealer Damages Classes as defined in
> the class action complaints filed in *In re: Vehicle Carrier Services Antitrust
> Litigation*, MDL No. 2471, No. 13-3306 (D.N.J.).

79.     Excluded from the proposed class are (a) Defendants; (b) their parent companies,

subsidiaries, and affiliates; (c) any co-conspirators; (d) federal governmental entities and

instrumentalities of the federal government; (e) states and their subdivisions, agencies, and

instrumentalities; and (f) persons who purchased Vehicle Carrier Services directly.

80.     While Plaintiffs do not know the exact number of members of the proposed class,

Plaintiffs believe there are, at a minimum, thousands.

81.     Common questions of law and fact exist as to all members of the proposed class.

Such questions include:

> (a) whether the MOU constituted a valid, binding contract between Defendants
>     and Plaintiffs and the members of the proposed class;
>
> (b) whether K Line paid the sums agreed to in the MOU;
>
> (c) whether Defendants breached their contract with Plaintiffs and members of the
>     proposed class by failing to pay the sums due under the MOU;
>
> (d) whether Defendants committed an anticipatory breach by refusing to honor their
>     commitments under the MOU;
>
> (e) whether Defendants sought and received board approval of the settlement;
>
> (f) whether Defendants breached their covenant of good faith and fair dealing;

(g) whether injunctive and related equitable relief, including specific performance of the contract, is appropriate;

(h) how class-wide damages should be measured; and

(i) the monetary value of the damages suffered by the members of the proposed class.

82. Plaintiffs' claims are typical of those of the members of the proposed class, and Plaintiffs will fairly and adequately protect the interests of the proposed class. Plaintiffs and each member of the proposed class did not obtain the benefit of their bargain with Defendants under the MOU. Therefore, Plaintiffs and the members of the proposed class have been similarly affected by Defendants' wrongful conduct.

83. Plaintiffs' claims arise out of the same course of conduct giving rise to the claims of the other members of the proposed class—that is, Defendants' breach of the MOU by refusing to and failing to pay the promised funds. Plaintiffs' interests are not antagonistic to those of the other members of the proposed class. Plaintiffs are represented by counsel who are competent and experienced in complex breach of contract and class action litigation.

84. The questions of law and fact common to the members of the proposed class (including the legal and factual issues described above) predominate over any questions affecting only individual members.

85. Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Among other things, a class action will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously and without the inefficient duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured

persons with a method for obtaining redress for claims that might be impracticable to pursue individually, substantially outweigh any minor difficulties that may arise in management of this class action.

86.      The prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent or varying adjudications and so of establishing incompatible standards of conduct for Defendants.

## **FIRST COUNT**
### **(Breach Of Contract)**

87.      Plaintiffs repeat every allegation set forth above as if fully set forth herein.

88.      By executing the MOU, Plaintiffs and Defendants entered into a valid, binding, and enforceable contract.

89.      Defendants agreed to pay a sum certain; in exchange, Plaintiffs agreed to dismiss their antitrust claims against Defendants and not to file any lawsuits asserting claims related to the sale of Vehicle Carrier Services. The promises made by Plaintiffs and the members of the proposed class in the MOU constituted fair consideration for Defendants' promise to pay.

90.      To the extent that the lack of approval of the settlement in the District of New Jersey frustrated Defendants' purpose in obtaining a class-wide release or rendered their performance impracticable, Defendants remain bound to render their performance because they expressly agreed that the MOU would remain binding regardless of adverse events, such as a grant of Defendants' motion to dismiss.

91.      Any duties imposed on Plaintiffs by the MOU have been performed, have been excused, or have not yet come due.

92.      Defendants breached their contractual duties, including their covenant of good faith and fair dealing, by failing to pay the agreed-upon monies.

93.     Alternately, by refusing to commit to paying the agreed-upon monies, Defendants have committed an anticipatory breach of their contract and have breached the implied covenant of good faith and fair dealing.

94.     To the extent that Defendants assert that board approval was necessary to make their promise binding (a position that is contrary to the MOU's terms) and that they failed to secure board approval (which, on information and belief, is also untrue), any lack of board approval does not obviate their duty to pay the agreed-upon sum of money. If Defendants failed to secure board approval, their failure to take steps to do so breached their covenant of good faith and fair dealing. Any such failure to follow through with their unambiguous promises was done arbitrarily or unfairly and/or resulted from their dishonest representation that board approval would be secured.

95.     Plaintiffs and the members of the proposed class were parties to the MOU. In the alternative, if the unnamed members of the proposed class were not parties to the MOU because a class had not yet been certified in the Antitrust Action, then the unnamed members of the proposed class are intended third-party beneficiaries of the MOU pursuant to section 2A:15-2 of the New Jersey Statutes.

96.     Plaintiffs are entitled to their contract damages plus pre- and post-judgment interest and the fees and costs incurred to bring Defendants into compliance with their contractual obligations.

97.     Alternately, K Line's breach of its duties under the MOU entitles Plaintiffs to specific performance of the MOU.

WHEREFORE, Plaintiffs, on behalf of the members of the proposed class, respectfully request that this Court enter judgment in their favor and award relief as follows:

a.     all damages to which Plaintiffs and the members of the proposed class are entitled, including but not limited to compensatory damages, consequential damages, pre-

and post-judgment interest, fees and costs of this suit, and all other sums allowed by law;

b.        specific performance of the contract; and

c.        such other relief that this Court deems appropriate.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiffs


By:_____
        JAMES E. CECCHI

Dated: March 31, 2021

Warren T. Burns
Daniel H. Charest
Will Thompson
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002

Korey A. Nelson
Patrick D. Murphree
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, Louisiana 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

Adam J. Zapala
Elizabeth Castillo
**COTCHETT, PITRE &
McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Alexander E. Barnett
**COTCHETT, PITRE &
McCARTHY, LLP**

Jonathan W Cuneo
Joel Davidow
Katherine Van Dyck
Daniel Cohen
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave, NW, Ste. 200
Washington, DC 20016
Telephone (202) 789-3960

Don Barrett
David McMullan
**BARRETT LAW GROUP, P.A.**
404 Court Square
P.O. Box 927
Lexington, Mississippi 39095
Telephone: (662) 834-2488

J. Manly Parks
**DUANE MORRIS LLP**
30 S 17th Street
Philadelphia, Pennsylvania 19103
Telephone (215) 979-1000
Facsimile (215) 979-1020

40 Worth Street
10th Floor
New York, New York 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable, pursuant to Rules 1:8-2(b) and 4:35-1(a) of the New Jersey Rules of Court.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiffs

By:_____
          JAMES E. CECCHI

Dated: March 31, 2021

Warren T. Burns
Daniel H. Charest
Will Thompson
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002

Korey A. Nelson
Patrick D. Murphree
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, Louisiana 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

Adam J. Zapala
Elizabeth Castillo
**COTCHETT, PITRE &
McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Alexander E. Barnett
**COTCHETT, PITRE &
McCARTHY, LLP**
40 Worth Street

Jonathan W Cuneo
Joel Davidow
Katherine Van Dyck
Daniel Cohen
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave, NW, Ste. 200
Washington, DC 20016
Telephone (202) 789-3960

Don Barrett
David McMullan
**BARRETT LAW GROUP, P.A.**
404 Court Square
P.O. Box 927
Lexington, Mississippi 39095
Telephone: (662) 834-2488

J. Manly Parks
**DUANE MORRIS LLP**
30 S 17th Street
Philadelphia, Pennsylvania 19103
Telephone (215) 979-1000
Facsimile (215) 979-1020

23

10th Floor
New York, New York 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753

## CERTIFICATION OF NO OTHER ACTIONS

Pursuant to R. 4:5-1(b)(2), it is hereby stated that the matter in controversy is not the subject of any other action pending in any other court or of a pending arbitration proceeding to the best of our knowledge or belief. Also, to the best of our belief, no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this pleading, we know of no other parties that should be joined in the above action. In addition, we recognize the continuing obligation of each party to file and serve on all parties and the court an amended certification if there is a change in the facts stated in this original certification.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiffs


By:___/s/ James E. Cecchi_____
     JAMES E. CECCHI

Dated: March 31, 2021

| | |
|---|---|
| Warren T. Burns | Jonathan W Cuneo |
| Daniel H. Charest | Joel Davidow |
| Will Thompson | Katherine Van Dyck |
| **BURNS CHAREST LLP** | Daniel Cohen |
| 900 Jackson Street, Suite 500 | **CUNEO GILBERT & LADUCA, LLP** |
| Dallas, Texas 75202 | 4725 Wisconsin Ave, NW, Ste. 200 |
| Telephone: (469) 904-4550 | Washington, DC 20016 |
| Facsimile: (469) 444-5002 | Telephone: (202) 789-3960 |
| | |
| Korey A. Nelson | Don Barrett |
| Patrick D. Murphree | David McMullan |
| **BURNS CHAREST LLP** | **BARRETT LAW GROUP, P.A.** |
| 365 Canal Street, Suite 1170 | 404 Court Square |
| New Orleans, Louisiana 70130 | P.O. Box 927 |
| Telephone: (504) 799-2845 | Lexington, Mississippi 39095 |
| Facsimile: (504) 881-1765 | Telephone: (662) 834-2488 |
| | |
| Adam J. Zapala | J. Manly Parks |
| Elizabeth Castillo | **DUANE MORRIS LLP** |
| **COTCHETT, PITRE &** | 30 S 17th Street |
| **McCARTHY, LLP** | Philadelphia, Pennsylvania 19103 |

San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Alexander E. Barnett
**COTCHETT, PITRE &
McCARTHY, LLP**
40 Worth Street
10th Floor
New York, New York 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753

Telephone (215) 979-1000
Facsimile (215) 979-1020

# Exhibit A

**Memorandum of Understanding**
*In re Vehicle Carrier Services Antitrust Litigation,*
**MDL 2471, Master Docket No. 13-cv-3306**
**Now Pending in the U.S. District Court for the District of New Jersey**

This Memorandum of Understanding ("MOU"), made and effective as of July 23, 2015, subject to approval by K Line's Board of Directors, which is expected on or about July 31, 2015, sets forth the essential terms of the settlement (the "Settlement") agreed to by defendants Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., and their affiliates (collectively, "K Line") and End-Payor, Automobile Dealer, and Truck and Equipment Dealer Plaintiffs (collectively, "Indirect Purchaser Plaintiffs") in the above-referenced action (the "Action"):

1. By entering into this Settlement, K Line admits no liability to Indirect Purchaser Plaintiffs or the Classes (defined below). K Line maintains that it has meritorious defenses.

2. For purposes of effectuating the Settlement and releases contemplated by this MOU, K Line will consent to the certification of settlement classes (the "Classes") of Indirect Purchaser Plaintiffs in the indirect purchaser states, to be defined as alleged in each of their operative complaints. To effectuate the Settlement, K Line will also consent to the appointment of plaintiffs as settlement class representatives for each of the Classes and to the appointment of current interim co-lead counsel as Settlement Class Counsel for each of the Classes.

3. To settle all claims against K Line, as set forth below and more fully in the parties' anticipated settlement agreement, in the *In re Vehicle Carriers Antitrust Litigation*, by Indirect Purchaser Plaintiffs on behalf of themselves and the Classes, K Line will pay a total of USD ▆▆▆▆▆▆▆ (the "Settlement Amount"). Within 30 days of the effective date of this MOU, K Line will deposit USD ▆▆▆▆▆▆ into interest bearing escrow accounts as directed by the Indirect Purchaser Plaintiffs.

4. The sum of ▆▆▆▆▆▆ of the Settlement Amount shall be allocated to the End-Payor Plaintiffs and deposited into an escrow account at their direction.

5. The Automobile Dealer and Truck Dealer Plaintiffs shall divide the remaining ▆▆▆▆▆ by:

    a. Agreement, reflecting the dollar volume of commerce affected by the conspiracy with respect to the claims of their respective classes; or
    b. Arbitration, should the Automobile Dealer and Truck and Equipment Dealer Plaintiffs be unable to agree on the proper division.

6. From the escrow accounts, the following will be paid:

1

a. Upon the direction of Settlement Class Counsel, and prior to final approval by the Court of the Settlement, all costs of providing notice to the Classes and settlement fund administration will be paid out of the escrow account on a non-recoupable basis. Settlement Class Counsel shall attempt to defray the costs of notice by combining settlements if permitted by the Court to do so.

b. Attorneys' fees, costs and expenses and class plaintiff service awards awarded to Class Counsel and plaintiffs by the Court will be paid out of the escrow account. K Line will take no position on Class Counsel's application for attorneys' fees, costs and expenses or for service awards to the plaintiffs.

c. To authorized Class member claimants, Class Counsel shall have sole discretion to propose a plan of allocation to the Court, and no funds remaining in the escrow account shall revert to K Line. This is not a "claims made" settlement.

d. For the avoidance of doubt, none of the payments described above in Sections 6(b) or 6(c) shall be made until after the Effective Date of the Settlement. Further, if the court rejects the Settlement, the funds remaining in any escrow account shall revert to "K" Line.

7. Effective upon the finality of the Court's judgment granting final approval to the Settlement, plaintiffs and the Classes shall formally release K Line from claims they have asserted or may have asserted related to the sale of Vehicle Carrier Services in *In re Vehicle Carrier Services Antitrust Litigation* (including any potential antitrust or competition claims, any and all maritime claims, including claims arising under the Shipping act, etc.), subject to full opt-out rights and notice. Indirect Purchaser Plaintiffs' complaints against K Line will be dismissed with prejudice. Indirect Purchaser Plaintiffs and any Class member shall further agree not to file any lawsuit asserting such released claims. It is the parties' intent that any appeals shall not delay the use of funds.

8. Indirect Purchaser Plaintiffs will submit to the Court motions for preliminary approval of the Settlement. Indirect Purchaser Plaintiffs will prepare all documents in support of the settlement and will consult with counsel to K Line prior to filing. The "Effective Date" of the Settlement shall be the date that an order approving the Settlement has become a final and non-appealable order.

9. K Line will provide reasonable, satisfactory, and timely cooperation to Indirect Purchaser Plaintiffs and the Classes with respect to their continued prosecution of the Action against the remaining defendants, including but not limited to:

a. Furnishing all documents or other items given to U.S. government agencies in connection with vehicle carrier investigations that correspond to the claims in this Action;

b. Providing transaction data.

    c.  Providing a full account of all facts known to K Line potentially relevant to the claims asserted in the Action; and

    d.  Using K Line's reasonable best efforts to secure and facilitate cooperation from individuals and K Line's corporate representatives with knowledge or information relating to the claims asserted in the Action, and making them available for interviews, depositions, or testimony at trial as Indirect Purchaser Plaintiffs may reasonably require.

    e.  For the avoidance of doubt, K Line's performance of its cooperation obligations under this Paragraph is subject to consultation with the U.S. Department of Justice to ensure that the cooperation is acceptable to the U.S. Department of Justice and not inconsistent with K Line's obligations under its plea agreement.

10. The parties expect to enter into a long-form settlement agreement providing further details regarding this MOU. The parties commit to enter into good faith negotiations to execute the long-form agreement, which they expect to supersede the terms of this MOU. However, the parties intend this MOU to be a binding agreement effective as of the date set forth above regardless of whether the long-form settlement agreement is ever executed and regardless of the occurrence of any decisions, developments or events materially adverse to plaintiffs, K Line, or any of the other parties in the Action.

11. The parties further agree that the long-form settlement shall contain a clause providing for the reduction of the Settlement Amount in the event the Indirect Purchaser Plaintiffs settle with any other defendant on more favorable monetary terms as measured by the agreed respective market shares. Indirect Purchaser Plaintiffs agree to inform "K" Line of any settlement with any other defendant, including the monetary terms of such settlement, for the purpose of determining whether the settlement is more favorable than the Settlement. "K" Line agrees to maintain the confidentiality of the fact and terms of any such information. Further, the clause shall cease to be binding in the event the court grants defendants' collective motion to dismiss the Indirect Purchaser Plaintiffs complaints, denies class certification, or grants summary judgment in favor of defendants resolving the plaintiffs' damages claims in their entirety in favor of defendants, and none of Indirect Purchaser Plaintiffs prevail on appeal on the relevant motion.

12. The parties further agree that the long-form settlement shall provide additional and sufficient detail regarding K Line's cooperation obligations.

13. Should Class Members accounting for more than fifteen percent (15%) of the purchasers of any of the three classes at issue opt-out of this Settlement, K Line shall be entitled to a reduction in the total Settlement Amount that the Class at issue would receive in accordance with this MOU measured by the difference between the percentage of Class members who opt out and fifteen percent (15%). For the avoidance of doubt, if twenty-five percent (25%) of a Class opts out, K Line would be

entitled to a ten percent (10%) reduction.  In the case of the automobile dealers and truck and equipment dealers, the number of purchasers shall be measured by number of physical dealerships ("rooftops").

14. Upon execution of this MOU by all signatories hereto, Indirect Purchaser Plaintiffs may inform the Court that they have reached an agreement in principle to settle this Action with K Line and request that the Court stay the proceedings.  The amount of the Settlement shall be held confidential until such time as Indirect Purchaser Plaintiffs and K Line have entered into a definitive settlement agreement.  However, Indirect Purchaser Plaintiffs may at any time inform the Court of the amount of the Settlement *in camera*.

15. The signatories to this MOU have been duly authorized to execute this MOU and make it binding upon the parties on whose behalf they are signing.  The parties recognize that the Settlement is subject to approval by "K" Line's Board of Directors.  Such approval is expected on or about July 31, 2015.

Dated: July 23, 2015.

KAWASAKI KISEN KAISHA, LTD.

By: _____ Jeremy Calsyn

Its: Counsel

"K" LINE AMERICA, INC.

By: _____ Jeremy Calsyn

Its: Counsel

INDIRECT PURCHASER PLAINTIFFS

END-PAYOR PLAINTIFFS

By:   _____

Title:   Interim Co-Lead Counsel for the End-Payor Plaintiffs


AUTOMOBILE DEALER PLAINTIFFS

By:   _____

Title:   Interim Co-Lead Counsel for the Automobile Dealer Plaintiffs


TRUCK AND EQUIPMENT DEALER PLAINTIFFS

By:   _____

Title:   Interim Co-Lead Counsel for the Truck and Equipment Dealer Plaintiffs

# Exhibit B

**Letter Agreement Amending Memorandum of Understanding**
***In re Vehicle Carrier Services Antitrust Litigation,***
**MDL 2471, Master Docket No. 13-3306,**
**Now Pending in the U.S. District Court for the District of New Jersey**

This Letter Agreement, made and effective as of August 20, 2015, amends the Memorandum of Understanding ("MOU"), made and effective as of July 23, 2015, among defendants Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., and their affiliates (collectively, "K Line") and End-Payor, Automobile Dealer, and Truck and Equipment Dealer Plaintiffs (collectively, "Indirect Purchaser Plaintiffs") in the above-referenced action (the "action") as follows:

- Paragraph 3 of the MOU is hereby replaced with the following revised Paragraph 3:

> To settle all claims against K Line, as set forth below and more fully in the parties' anticipated settlement agreement, in the *In re Vehicle Carriers Antitrust Litigation*, by Indirect Purchaser Plaintiffs on behalf of themselves and the Classes, K Line will pay a total of USD ▮▮▮▮▮ (the "Settlement Amount"). Within 30 days of the effective date of this MOU, K Line will deposit USD ▮▮▮▮▮ into interest bearing escrow accounts as directed by the Indirect Purchaser Plaintiffs. Notwithstanding the thirty-day deposit deadline provided by this Paragraph 3, K Line shall have an additional ten (10) business days to complete the deposit of the Settlement Amount following the date on which counsel for the Indirect Purchaser Plaintiffs provide counsel for K Line with the necessary escrow account information (including, but not limited to, the account number, the SWIFT code, the name and address of the account holder, and the beneficiary/receiver for the escrow accounts of the End-Payor Plaintiffs, the Automobile Dealer Plaintiffs, and the Truck and Equipment Dealer Plaintiffs, respectively. For the avoidance of doubt, if the Indirect Purchaser Plaintiffs provide K Line with the necessary escrow account information on Monday, August 17, 2015, then K Line shall complete the deposit of the Settlement Amount into the respective escrow accounts on or before Monday, August 31, 2015.

Except as expressly provided herein, nothing in this Letter Agreement shall modify the terms or conditions of the MOU, or be construed as a waiver of any Party's rights or responsibilities under the MOU or otherwise.

The signatories to this Letter Agreement have been duly authorized to execute this Letter Agreement and make it binding upon the parties on whose behalf they are signing.

**20**

Dated: August 1, 2015.

**KAWASAKI KISEN KAISHA, LTD.**

By: 
    Jeremy J. Calsyn

Title:  Counsel

**"K" LINE AMERICA, INC.**

By: 
    Jeremy J. Calsyn

Title:  Counsel

**INDIRECT PURCHASER PLAINTIFFS**

By: 
    Warren T. Burns

Title:  Interim Co-Lead Counsel for the End-Payor Plaintiffs, and with permission of the
Interim Co-Lead Counsel for the Automobile Dealership and Truck and Equipment
Dealership Plaintiffs.

2

James E. Cecchi (NJ Bar No. 030861989)
Lindsey H. Taylor (NJ Bar No. 016781986)
CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700
Attorneys for Plaintiffs

| | |
|---|---|
| JILL ALBAN, GRANT ALBAN, MARY ARNOLD, AL BAKER, KATRINA BONAR, STEVEN BRUZONSKY, MONICA BUSHEY, MELINDA DENEAU, JENNIFER DILLON, JEFFREY L. GANNON, PAMELA GOESSLING, THOMAS GOESSLING, SHERYL HALEY, LESLEY DENISE HART, BRUCE HERTZ, MARIA KOOKEN, ADAIR LARA, KORI LEHRKAMP, MICHAEL LEHRKAMP, JOHN LEVYA, DANIEL MORRIS, JUDY A. REIBER, RICHARD TOMASKO, JOHN O'NEILL JOHNSON TOYOTA, RUSH TRUCK CENTERS OF ARIZONA, INC., *on behalf of themselves and all others similarly situated,* | SUPERIOR COURT OF NEW JERSEY LAW DIVISION:MERCER COUNTY DOCKET No. |
| Plaintiffs, | |
| v. | **COMPLAINT and** <br> **DEMAND FOR JURY TRIAL** |
| KAWASAKI KISEN KAISHA, LTD., "K" LINE AMERICA, INC., AND THEIR AFFILIATES, | |
| Defendants | |

Plaintiffs Jill Alban, Grant Alban, Mary Arnold, Al Baker, Katrina Bonar, Steven Bruzonsky,

Monica Bushey, Melinda Deneau, Jennifer Dillon, Jeffrey L. Gannon, Pamela Goessling, Thomas

Goessling, Sheryl Haley, Lesley Denise Hart, Bruce Hertz, Maria Kooken, Adair Lara, Kori

Lehrkamp, Michael Lehrkamp, John Levya, Daniel Morris, Judy Reiber, Richard Tomasko, John

O'Neill Johnson Toyota, LLP, and Rush Truck Centers of Arizona, Inc. (collectively "Plaintiffs"),

on behalf of themselves and all others similarly situated, by way of Complaint against Defendants Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., and their affiliates, allege as follows:

## INTRODUCTION

1.      This case arises from Defendants' breach of their clear and unambiguous settlement agreement with Plaintiffs.

2.      This agreement followed Defendants' participation in a global conspiracy to fix, raise, maintain, and stabilize prices and to allocate the market and customers for "Vehicle Carrier Services."[1] To obtain relief and hold the conspirators accountable for the harm caused by their scheme, Plaintiffs filed class actions under state and federal antitrust law (the "Antitrust Action").

3.      While a motion to dismiss was pending in the Antitrust Action, the parties (Plaintiffs and Defendants) agreed to a settlement and memorialized their agreement in a signed Memorandum of Understanding (the "MOU"), which they executed on July 23, 2015 in Trenton, New Jersey.[2] In the MOU, Defendants agreed to pay to the members of the proposed class a substantial sum of money in exchange for the release of "claims [they] have asserted or may have asserted related to the sale of Vehicle Carrier Services."

4.      The MOU declared that it was a "binding agreement" to be "effective . . . regardless of . . . events materially adverse to [P]laintiffs, K Line, or any of the other parties."

5.      Through this agreed-upon language, the parties made the MOU effective on July 23, 2015, and ensured that Defendants' obligation to pay persisted irrespective of any subsequent

---

[1]      Vehicle carriers transport large numbers of cars, trucks, and other automotive vehicles, including agriculture and construction equipment, across large bodies of water using specialized cargo ships known as Roll On/Roll Off vessels ("RoRos"). "Vehicle Carrier Services" refers to the paid ocean transportation of new, assembled motor vehicles by RoRo.

[2]      Attached as Exhibit A with the settlement amount redacted.

occurrence, including a grant of Defendants' motion to dismiss for lack of jurisdiction—a motion that had been pending for over seven months when the parties executed the MOU.

6.    The MOU further declared that "in the event the court grants [D]efendants' collective motion to dismiss" Plaintiffs' antitrust claims, the <u>only</u> provision that would become nonbinding was a settlement provision reducing (under certain circumstances not applicable here) the amount Defendants would owe to the members of the proposed class.

7.    Despite the parties' clear intent to create a binding agreement that would survive dismissal of the Antitrust Action or any adverse event to Plaintiffs, Defendants refused to honor their obligations under the MOU after the court hearing the Antitrust Action granted the motion to dismiss.

8.    Because Defendants breached the MOU, Plaintiffs and the other members of the proposed class have suffered and will continue to suffer substantial injuries. For themselves and on behalf of the members of the proposed class, Plaintiffs seek a judgment requiring Defendants to honor their contractual obligations and pay what they owe.

## PARTIES

### I.    Plaintiffs

9.    Jill Alban is a Montana resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Alban was one of the plaintiffs who entered into the MOU, which Defendants breached.

10.    Grant Alban is a Montana resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Alban was one of the plaintiffs who entered into the MOU, which Defendants breached.

11.     Plaintiff Mary Arnold is a Tennessee resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Arnold was one of the plaintiffs who entered into the MOU, which Defendants breached.

12.     Plaintiff Al Baker is a North Dakota resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Baker was one of the plaintiffs who entered into the MOU, which Defendants breached.

13.     Plaintiff Katrina Bonar is a West Virginia resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Bonar was one of the plaintiffs who entered into the MOU, which Defendants breached.

14.     Plaintiff Steven Bruzonsky is an Arizona resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Bruzonsky was one of the plaintiffs who entered into the MOU, which Defendants breached.

15.     Plaintiff Monica Bushey is a Maine resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Bushey was one of the plaintiffs who entered into the MOU, which Defendants breached.

16.     Melinda Deneau is a New Hampshire resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Deneau was one of the plaintiffs who entered into the MOU, which Defendants breached

17.     Plaintiff Jennifer Dillon is a Michigan resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Dillon was one of the plaintiffs who entered into the MOU, which Defendants breached.

4

18.     Plaintiff Jeffrey L. Gannon is a Kansas resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Gannon was one of the plaintiffs who entered into the MOU, which Defendants breached.

19.     Plaintiff Pamela Goessling is a Missouri resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Goessling was one of the plaintiffs who entered into the MOU, which Defendants breached.

20.     Plaintiff Thomas Goessling is a Missouri resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Goessling was one of the plaintiffs who entered into the MOU, which Defendants breached.

21.     Plaintiff Sheryl Haley is a Utah resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Haley was one of the plaintiffs who entered into the MOU, which Defendants breached.

22.     Plaintiff Lesley Denise Hart is a South Carolina resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Hart was one of the plaintiffs that entered into the binding settlement agreement with Defendants, which Defendants breached.

23.     Plaintiff Bruce Hertz is a Florida resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Hertz was one of the plaintiffs who entered into the MOU, which Defendants breached.

24.     Plaintiff Maria Kooken is a Nebraska resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Kooken was one of the plaintiffs who entered into the MOU, which Defendants breached.

25.     Plaintiff Adair Lara is a California resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Lara was one of the plaintiffs who entered into the MOU, which Defendants breached.

26.     Plaintiff Kori Lehrkamp is a South Dakota resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Lehrkamp was one of the plaintiffs who entered into the MOU, which Defendants breached.

27.     Plaintiff Michael Lehrkamp is a South Dakota resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Lehrkamp was one of the plaintiffs who entered into the MOU, which Defendants breached.

28.     Plaintiff John Levya is a Nevada resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Levya was one of the plaintiffs who entered into the MOU, which Defendants breached.

29.     Plaintiff Daniel Morris is an Oregon resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Morris was one of the plaintiffs who entered into the MOU, which Defendants breached.

30.     Plaintiff Judy A. Reiber is a Minnesota resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Ms. Reiber was one of the plaintiffs who entered into the MOU, which Defendants breached.

31.     Plaintiff Richard Tomasko is a Vermont resident who purchased Vehicle Carrier Services indirectly from one or more Defendants or their co-conspirators. Mr. Tomasko was one of the plaintiffs who entered into the MOU, which Defendants breached

32.     Plaintiff John O'Neill Johnson Toyota ("Johnson Toyota") is a Mississippi limited liability company with its principal place of business in Meridian, Mississippi. Johnson Toyota is

6

an authorized Toyota dealer that bought Toyota-brand vehicles shipped via RoRo by one or more

of the Defendants or their co-conspirators from the vehicles' country of origin to the United States.

Johnson Toyota was one of the plaintiffs who entered into the MOU, which Defendants breached.

33.    Plaintiff Rush Truck Centers of Arizona ("Rush AZ") is a Delaware corporation

with its principal place of business in Arizona. Rush AZ is an authorized Peterbilt and Hino Ford

dealer that bought vehicles that were shipped via RoRo by one or more of the Defendants or their

co-conspirators from the vehicles' country of origin to the United States. Rush AZ was one of the

plaintiffs who entered into the MOU, which Defendants breached.

34.    Counsel for Plaintiffs signed the MOU in Trenton, New Jersey.

## II.    Defendants

35.    Defendant Kawasaki Kisen Kaisha, Ltd. ("K Line") is a Japanese company with its

principal place of business at 1-1, Uchisaiwaicho 2-chome, Chiyoda-ku, Tokyo 100-8540. K

Line's subsidiaries act as its agents in the United States. K Line—directly and/or through its

subsidiaries, which it wholly owned and/or controlled—shipped new, assembled motor vehicles

to and from the United States. K Line—directly and/or through its subsidiaries, which it wholly

owned and/or controlled—provided, marketed, and/or sold Vehicle Carrier Services throughout

the United States. K Line facilitated and/or implemented the secret agreement and/or agreements

among the conspirators. K Line was a party to the MOU and repudiated it. K Line signed the MOU

in Trenton, New Jersey.

36.    Defendant "K" Line America, Inc. ("K Line America"), a Michigan corporation, is

a wholly owned subsidiary of K Line.  Its principal place of business is 4860 Cox Road, Suite 300,

Glen Allen, Virginia 23060. It acts as K Line's agent in the United States.  At all relevant times,

its activities in the United States were under the control and direction of K Line, which controlled

its policies, sales, and finances. K Line America shipped new, assembled motor vehicles to and

from the United States.  K Line America also provided, marketed, and/or sold Vehicle Carrier

Services throughout the United States. K Line America facilitated and/or implemented the secret

agreement and/or agreements among the conspirators. K Line America was a party to the MOU

and repudiated it. K Line America signed the MOU in Trenton, New Jersey.

## JURISDICTION AND VENUE

37.    This Court has personal jurisdiction over Defendants because the contract at issue

was negotiated, signed, and executed in Trenton, New Jersey. Therefore, Defendants have

purposefully availed themselves of the privilege of conducting activities within New Jersey, thus

invoking the benefits and protections of this state's laws. This Court's exercise of jurisdiction over

Defendants is consistent with due process.

38.    Venue is proper in this Court under Rule 4:3-2 of the New Jersey Rules of Court

for the Superior Courts because relevant conduct regarding the contract at issue, including its

negotiation and execution, took place in Trenton, New Jersey.

## FACTUAL ALLEGATIONS

**A.    Defendants engaged in a sweeping conspiracy to injure American consumers, resulting in Defendants admitting their guilt and paying hundreds of millions of dollars in fines.**

39.    This breach of contract action arises out of a massive, international conspiracy to

fix prices, allocate customers, and restrict capacity for Vehicle Carrier Services. The conspiracy

caused Plaintiffs to pay higher prices for cars and trucks shipped to the United States than they

would have in a competitive market for Vehicle Carrier Services.

40.    The conspiracy in which Defendants engaged was not loosely defined or

speculative. On the contrary, Defendants pleaded guilty to violating federal law and admitted that

they "participated in a conspiracy among ocean carriers of roll-on, roll-off cargo, the primary purpose of which was to suppress and eliminate competition by allocating customers and routes, rigging bids, and fixing prices for international ocean shipping services . . . in violation of the Sherman Antitrust Act, 15 U.S.C. § 1." The United States Department of Justice, the Japanese Fair Trade Commission, and the European Commission have fined Defendants and their co-conspirators hundreds of millions of dollars for fixing prices for Vehicle Carrier Services. Around the world, Defendants and their co-conspirators have paid well over $500 million to various regulatory and law enforcement bodies.

41.    Neither Defendants nor any of their co-conspirators have paid a single dollar to Plaintiffs in this action or to any other American consumer or business injured by their unlawful conduct.

42.    Plaintiffs filed class actions on behalf of various indirect purchasers of Vehicle Carrier Services for damages and injunctive relief under federal and state antitrust statutes. On October 8, 2013, the Judicial Panel on Multi-District Litigation transferred related actions to the District of New Jersey for consolidated pretrial proceedings.

43.    Following consolidation, Defendants and their co-conspirators filed a collective motion to dismiss the Antitrust Action.

**B.    Defendants chose to settle and executed the MOU.**

44.    After months of negotiation, Plaintiffs and Defendants entered into an MOU to settle the Antitrust Action. The MOU was effective July 23, 2015.[3]

---

[3]  The MOU declared that counsel signing the MOU on Defendants' behalf were "duly authorized to execute this MOU and make it binding" upon Defendants.

9

45. Faced with substantial evidence of their misconduct, including a guilty plea from the "team leader and general manager in K Line's car carrier division," Defendants determined that settlement was a strategic choice that would manage their risk by eliminating the possibility of monetary liability of a magnitude far exceeding than the settlement amount.

46. Defendants agreed to provide members of the proposed class with monetary compensation. In exchange, Plaintiffs and the members of the proposed class agreed to release Defendants "from claims they have asserted or may have asserted related to the sale of Vehicle Carrier Services."

47. The MOU required Defendants to place the settlement funds in escrow within 30 days of the effective date, that is, by August 22, 2015. Effective August 20, 2015, Plaintiffs and Defendants amended the MOU to grant Defendants an "additional ten (10) business days to complete the deposit of the Settlement Amount following the date on which the Indirect Purchaser Plaintiffs[4] provide counsel for K Line with the necessary escrow account information."[5]

48. Plaintiffs have provided Defendants with sufficient wiring and bank transfer information to effectuate transfer of the settlement amount. More than ten business days have passed since Defendants' receipt of such information.

**C.    The parties drafted the MOU to ensure that Defendants' obligation to pay remained binding even if they prevailed on their pending motion to dismiss.**

49. When the parties executed the MOU on July 23, 2015, Defendants had already filed a motion to dismiss Plaintiffs' claims for lack of federal subject matter jurisdiction. At that point, the motion had been pending for over seven months.

---

[4] The Indirect Purchaser Plaintiffs referenced in the MOU are the same as the members of the class proposed in this complaint.

[5] The amendment to the MOU with the settlement amount redacted is attached as Exhibit B.

50.     Both Plaintiffs and Defendants faced risk: Plaintiffs faced the risk that their claim would be dismissed for want of jurisdiction; Defendants faced the risk that their motion would be denied, subjecting them to an increased risk of substantial liability following an adverse trial verdict. The need to resolve this uncertainty was central to the parties' decision to settle and to Plaintiffs' willingness to accept a discounted recovery.

51.     To avoid precisely the situation that resulted in the present suit—a refusal to pay— the MOU included provisions that accounted for the possibility that Defendants' motion would be granted. These provisions ensured that dismissal would not and did not excuse Defendants' obligation to pay the promised settlement amount to the members of the proposed class.

52.     Paragraph 10 of the MOU provided, in pertinent part:

[T]he parties intend this MOU to be a binding agreement effective as of [July 27, 2015] regardless of whether the long-form settlement agreement is ever executed and regardless of the occurrence of any decisions, developments or events materially adverse to plaintiffs . . . .

53.     Paragraph 10 unambiguously provides that Defendants' obligation to pay to Plaintiffs the settlement amount persists "regardless of the occurrence of any decisions, developments or events materially adverse to [P]laintiffs." The granting of Defendants' motion to dismiss the Antitrust Action is certainly a "decision" or "development" that was "materially adverse to [P]lainitffs."

54.     This provision reflects an unremarkable principle common to settlement agreements in complex, multiparty cases. Because litigation always involves the risk that future developments might increase or decrease parties' likelihood of success and their potential liability (or for plaintiffs, recovery), parties settle on terms to manage that risk. Defendants made the choice to reduce their risk to certainty—the certainty that they would not be liable to Plaintiffs for more

than the settlement amount. For their part, Plaintiffs accepted a discounted amount for the certainty of payment.

55.     Paragraph 11 eliminates all possible doubt that dismissal of the Antitrust Action for lack of federal subject matter jurisdiction excused Defendants' obligation to pay. That paragraph involved a "Most Favored Nation Clause," a common provision in agreements with early-settling defendants, such as Defendants here. The paragraph provided:

> The parties further agree that the long-form settlement agreement shall contain a clause providing for the reduction of the Settlement Amount in the event the Indirect Purchaser Plaintiffs settle with any other defendants on more favorable monetary terms as measured by the agreed respective market shares. . . . [T]he clause shall cease to be binding in the event the court grants defendants' collective motion to dismiss the Indirect Purchaser Plaintiffs['] complaints, denies class certification, or grants summary judgment in favor of defendants resolving the plaintiffs' damages claims in their entirety in favor of defendants, and none of Indirect Purchaser Plaintiffs prevail on appeal of the relevant motion.

56.     Under this provision, Plaintiffs' future settlements with other vehicle carrier defendants might have reduced the amount that Defendants would owe. However, there would be no reduction if (as happened), the Antitrust Action were to be dismissed. By means of this provision, the parties agreed that even if dismissal of the Antitrust Action reduced the liability of other vehicle carriers to zero, Defendants' liability would remain fixed at the amount agreed to in the MOU.

57.     This paragraph demonstrates that the parties knew how to specify the effect of a dismissal of the Antitrust Action on their obligations under the MOU. By singling out a particular contractual provision that would become inoperative in the event of a dismissal of the Antitrust Action, the MOU confirmed the parties' mutual understanding that Defendants' other obligations would survive dismissal.

58.     Under the law, every provision of a contract must be given effect. The MOU
declares that a specific provision to be included in a future long-form settlement—dealing with a
"motion-favored nation" clause common to class settlements—would become nonbinding if the
motion to dismiss were to be granted. If a grant of the motion to dismiss the Antitrust Action
terminated the entire settlement agreement, as K Line contends, then this provision would become
superfluous. There is no need for a provision specifying that a grant of the motion to dismiss would
render a specific provision nonbinding if dismissal rendered the entire MOU nonbinding.

59.     Any reading of the MOU that excuses Defendants from payment following
dismissal of the Antitrust Action also defies common sense. No plaintiff would settle at a discount
if prevailing on a pending motion to dismiss would let a defendant walk away from the settlement.
Defendants cannot avoid their obligations because hindsight shows that rolling the dice on the
motion to dismiss would have been more favorable.

60.     Here, Defendants, who are not strangers to litigation and represented by competent
counsel, cannot feign surprise that a situation would occur where they settled the matter and then
subsequently prevailed on their motion to dismiss: On the very same day that Defendants agreed
to these provisions, the District of New Jersey heard oral argument on the motion to dismiss. Thus,
when they executed the MOU, Defendants knew that they might prevail. Nevertheless, they
consciously chose to settle for a sum certain in a binding agreement.

61.     Defendants' choice reveals their intent, effectuated through the language of the
MOU and derived from standard principles of contract law.

62.     This intent reflects the commonsensical understanding of all participants in early
settlements of complex litigation and now requires Defendants to fulfill their obligations and pay
the settlement amount agreed to in the MOU to Plaintiffs and the members of the proposed class.

63.     At bottom, Defendants' attempt to wriggle out of their promise ignores the express language of the MOU, the intent of the parties, the law of contract, and basic common sense.

**D.     Although they initially acknowledged their contractual commitments, Defendants ultimately refused to honor them.**

64.     On August 28, 2015, the District of New Jersey granted Defendants' motion and dismissed the Antitrust Action for lack of federal subject matter jurisdiction.

65.     Following the district court's decision on their motion to dismiss, Defendants **continued to negotiate** for months with Plaintiffs over the content of the long-form settlement and escrow agreements, thus confirming their understanding that their duty to pay the agreed-upon monies remained binding despite the district court's dismissal.

66.     Counsel for both parties circulated multiple redlines of the agreements. For instance, on September 10, 2015, counsel for Defendants stated via e-mail to counsel for Plaintiffs, "The escrow agreement changes are ok with me." Similarly, on April 9, 2016, counsel for Defendants sent Plaintiffs' counsel clean and redlined versions of the long-form settlement and escrow agreements.

67.     Defendants' apparent willingness to uphold their bargain was unremarkable, because Paragraphs 10 and 11 of the MOU had made clear that Defendants' obligation to pay the settlement amount persisted despite the grant of the motion to dismiss. Their conduct eliminates any doubt that their duty to pay not only survived dismissal but also survives to this day. Their prior conduct exposes the lack of merit in their current refusal to pay.

68.     Despite their initial acceptance of the continuing nature of their obligations, Defendants abruptly halted their participation in the process envisioned in the MOU.

69.     In February 2017, Plaintiffs notified Defendants of their duty to fulfill their obligations under the MOU and asked them to confirm their bargained-for promise. They refused

to honor that promise, taking the position (contrary to the MOU's clear language) that failure to obtain appellate reversal of the district court's dismissal would terminate the agreement.

70.     Defendants have never paid any of the settlement funds despite the unambiguous requirement to which they assented when executing the MOU.

71.     By failing to pay the sums due under the MOU, Defendants breached their contract with Plaintiffs. Alternately, by stating that they would refuse to honor their obligations under the MOU, Defendants committed an anticipatory breach of their contract with Plaintiffs.

72.     On May 13, 2020, Plaintiffs brought a breach-of-contract class action in the Eastern District of Virginia. In light of certain subject matter jurisdiction concerns raised by that court at oral argument, Plaintiffs voluntarily dismissed their action on January 7, 2021. The dismissal was without prejudice.

**E.      The MOU does not excuse Defendants' refusal to pay the settlement amount.**

73.     Defendants' assertion that dismissal of the Antitrust Action extinguished Defendants' obligation to pay cannot be squared with a proper and straightforward interpretation of the MOU. Defendants cannot escape their obligations by invoking Paragraph 7(d) of the MOU, which describes the rare occurrence when a court rejects a class action settlement: when a "court rejects the Settlement, the funds remaining in any escrow account shall revert to K Line."

74.     This unremarkable provision reflects the requirement of Rule 23(e) of the Federal Rules of Civil Procedure that a court protect the interests of unnamed class members by approving a class action settlement only after determining that it is fair, reasonable, and adequate.

75.     The parties intended the term "reject" to describe a judicial determination that the proposed settlement was unfair, unreasonable, or inadequate. Thus, Paragraph 7(d) provided that Defendants would get their money back only if—and only if—all of the following occurred: (a)

Defendants fulfilled their duty to pay the agreed-upon monies and deposited the funds in escrow; (b) the parties sought approval of the settlement; (c) the court rejected the settlement; and (d) Plaintiffs pressed forward with their claims.

76.    Under standard principles of contract interpretation, the meaning of a provision is not determined in isolation but rather in light of the other provisions of the contract. Hence, Paragraph 7(d) must be read together with Paragraph 10, which requires compliance "regardless of whether the long-form settlement agreement is ever executed and regardless of the occurrence of any decisions, developments or events materially adverse to plaintiffs." Because this provision ensured that Defendants' obligation to pay the settlement amount would survive dismissal of the Antitrust Action, expanding the meaning of "reject" in Paragraph 7(d) to include dismissal on jurisdictional grounds would violate this canon of interpretation.

77.    Paragraph 7(d) is thus inapplicable because the district court **did not reject** the settlement. The District of New Jersey never evaluated the fairness, reasonableness, or adequacy of the settlement under Rule 23(e). Instead, the court merely dismissed Plaintiffs' claims because, as a federal district court, it lacked the statutory authority to entertain them.

## CLASS ACTION ALLEGATIONS

78.    Plaintiffs seek all available legal and equitable relief under Rule 4:32-1(a), (b)(2), and (b)(3) for themselves and on behalf of the following proposed class:

> All persons and entities in the United States in the End-Payor, the Truck and Equipment Dealer, and the Automobile Dealer Damages Classes as defined in the class action complaints filed in *In re: Vehicle Carrier Services Antitrust Litigation*, MDL No. 2471, No. 13-3306 (D.N.J.).

79.    Excluded from the proposed class are (a) Defendants; (b) their parent companies, subsidiaries, and affiliates; (c) any co-conspirators; (d) federal governmental entities and

instrumentalities of the federal government; (e) states and their subdivisions, agencies, and instrumentalities; and (f) persons who purchased Vehicle Carrier Services directly.

80. While Plaintiffs do not know the exact number of members of the proposed class, Plaintiffs believe there are, at a minimum, thousands.

81. Common questions of law and fact exist as to all members of the proposed class. Such questions include:

> (a) whether the MOU constituted a valid, binding contract between Defendants and Plaintiffs and the members of the proposed class;
>
> (b) whether K Line paid the sums agreed to in the MOU;
>
> (c) whether Defendants breached their contract with Plaintiffs and members of the proposed class by failing to pay the sums due under the MOU;
>
> (d) whether Defendants committed an anticipatory breach by refusing to honor their commitments under the MOU;
>
> (e) whether Defendants sought and received board approval of the settlement;
>
> (f) whether Defendants breached their covenant of good faith and fair dealing;
>
> (g) whether injunctive and related equitable relief, including specific performance of the contract, is appropriate;
>
> (h) how class-wide damages should be measured; and
>
> (i) the monetary value of the damages suffered by the members of the proposed class.

82. Plaintiffs' claims are typical of those of the members of the proposed class, and Plaintiffs will fairly and adequately protect the interests of the proposed class. Plaintiffs and each member of the proposed class did not obtain the benefit of their bargain with Defendants under the

MOU. Therefore, Plaintiffs and the members of the proposed class have been similarly affected by Defendants' wrongful conduct.

83.     Plaintiffs' claims arise out of the same course of conduct giving rise to the claims of the other members of the proposed class—that is, Defendants' breach of the MOU by refusing to and failing to pay the promised funds.  Plaintiffs' interests are not antagonistic to those of the other members of the proposed class.  Plaintiffs are represented by counsel who are competent and experienced in complex breach of contract and class action litigation.

84.     The questions of law and fact common to the members of the proposed class (including the legal and factual issues described above) predominate over any questions affecting only individual members.

85.     Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Among other things, a class action will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously and without the inefficient duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons with a method for obtaining redress for claims that might be impracticable to pursue individually, substantially outweigh any minor difficulties that may arise in management of this class action.

86.     The prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent or varying adjudications and so of establishing incompatible standards of conduct for Defendants.

## FIRST COUNT
### (Breach Of Contract)

87.     Plaintiffs repeat every allegation set forth above as if fully set forth herein.

88.     By executing the MOU, Plaintiffs and Defendants entered into a valid, binding, and enforceable contract.

89.     Defendants agreed to pay a sum certain; in exchange, Plaintiffs agreed to dismiss their antitrust claims against Defendants and not to file any lawsuits asserting claims related to the sale of Vehicle Carrier Services. The promises made by Plaintiffs and the members of the proposed class in the MOU constituted fair consideration for Defendants' promise to pay.

90.     To the extent that the lack of approval of the settlement in the District of New Jersey frustrated Defendants' purpose in obtaining a class-wide release or rendered their performance impracticable, Defendants remain bound to render their performance because they expressly agreed that the MOU would remain binding regardless of adverse events, such as a grant of Defendants' motion to dismiss.

91.     Any duties imposed on Plaintiffs by the MOU have been performed, have been excused, or have not yet come due.

92.     Defendants breached their contractual duties, including their covenant of good faith and fair dealing, by failing to pay the agreed-upon monies.

93.     Alternately, by refusing to commit to paying the agreed-upon monies, Defendants have committed an anticipatory breach of their contract and have breached the implied covenant of good faith and fair dealing.

94.     To the extent that Defendants assert that board approval was necessary to make their promise binding (a position that is contrary to the MOU's terms) and that they failed to secure board approval (which, on information and belief, is also untrue), any lack of board approval does

19

not obviate their duty to pay the agreed-upon sum of money. If Defendants failed to secure board approval, their failure to take steps to do so breached their covenant of good faith and fair dealing. Any such failure to follow through with their unambiguous promises was done arbitrarily or unfairly and/or resulted from their dishonest representation that board approval would be secured.

95.     Plaintiffs and the members of the proposed class were parties to the MOU. In the alternative, if the unnamed members of the proposed class were not parties to the MOU because a class had not yet been certified in the Antitrust Action, then the unnamed members of the proposed class are intended third-party beneficiaries of the MOU pursuant to section 2A:15-2 of the New Jersey Statutes.

96.     Plaintiffs are entitled to their contract damages plus pre- and post-judgment interest and the fees and costs incurred to bring Defendants into compliance with their contractual obligations.

97.     Alternately, K Line's breach of its duties under the MOU entitles Plaintiffs to specific performance of the MOU.

WHEREFORE, Plaintiffs, on behalf of the members of the proposed class,  respectfully request that this Court enter judgment in their favor and award relief as follows:

a.      all damages to which Plaintiffs and the members of the proposed class are entitled, including but not limited to compensatory damages, consequential damages, pre- and post-judgment interest, fees and costs of this suit, and all other sums allowed by law;

b.      specific performance of the contract; and

c.      such other relief that this Court deems appropriate.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiffs

By:\_\_\_\_/s/ James E. Cecchi_____
JAMES E. CECCHI

Dated: February 26, 2021

Warren T. Burns
Daniel H. Charest
Will Thompson
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002

Korey A. Nelson
Patrick D. Murphree
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, Louisiana 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

Adam J. Zapala
Elizabeth Castillo
**COTCHETT, PITRE &
McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Alexander E. Barnett
**COTCHETT, PITRE &
McCARTHY, LLP**
40 Worth Street
10th Floor
New York, New York 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753

Jonathan W Cuneo
Joel Davidow
Katherine Van Dyck
Daniel Cohen
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave, NW, Ste. 200
Washington, DC 20016
Telephone (202) 789-3960

Don Barrett
David McMullan
**BARRETT LAW GROUP, P.A.**
404 Court Square
P.O. Box 927
Lexington, Mississippi 39095
Telephone: (662) 834-2488

J. Manly Parks
**DUANE MORRIS LLP**
30 S 17th Street
Philadelphia, Pennsylvania 19103
Telephone (215) 979-1000
Facsimile (215) 979-1020

# JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable, pursuant to Rules 1:8-2(b) and 4:35-1(a) of the New Jersey Rules of Court.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiffs


By:___/s/ James E. Cecchi_____
       JAMES E. CECCHI

Dated: February 26, 2021

| | |
|---|---|
| Warren T. Burns<br>Daniel H. Charest<br>Will Thompson<br>**BURNS CHAREST LLP**<br>900 Jackson Street, Suite 500<br>Dallas, Texas 75202<br>Telephone: (469) 904-4550<br>Facsimile: (469) 444-5002 | Jonathan W Cuneo<br>Joel Davidow<br>Katherine Van Dyck<br>Daniel Cohen<br>**CUNEO GILBERT & LADUCA, LLP**<br>4725 Wisconsin Ave, NW, Ste. 200<br>Washington, DC 20016<br>Telephone (202) 789-3960 |
| Korey A. Nelson<br>Patrick D. Murphree<br>**BURNS CHAREST LLP**<br>365 Canal Street, Suite 1170<br>New Orleans, Louisiana 70130<br>Telephone: (504) 799-2845<br>Facsimile: (504) 881-1765 | Don Barrett<br>David McMullan<br>**BARRETT LAW GROUP, P.A.**<br>404 Court Square<br>P.O. Box 927<br>Lexington, Mississippi 39095<br>Telephone: (662) 834-2488 |
| Adam J. Zapala<br>Elizabeth Castillo<br>**COTCHETT, PITRE &**<br>**McCARTHY, LLP**<br>San Francisco Airport Office Center<br>840 Malcolm Road, Suite 200<br>Burlingame, California 94010<br>Telephone: (650) 697-6000<br>Facsimile: (650) 697-0577 | J. Manly Parks<br>**DUANE MORRIS LLP**<br>30 S 17th Street<br>Philadelphia, Pennsylvania 19103<br>Telephone (215) 979-1000<br>Facsimile (215) 979-1020 |
| Alexander E. Barnett<br>**COTCHETT, PITRE &**<br>**McCARTHY, LLP**<br>40 Worth Street | |

10th Floor
New York, New York 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753

## CERTIFICATION OF NO OTHER ACTIONS

Pursuant to R. 4:5-1(b)(2), it is hereby stated that the matter in controversy is not the subject of any other action pending in any other court or of a pending arbitration proceeding to the best of our knowledge or belief. Also, to the best of our belief, no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this pleading, we know of no other parties that should be joined in the above action. In addition, we recognize the continuing obligation of each party to file and serve on all parties and the court an amended certification if there is a change in the facts stated in this original certification.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiffs


By:___/s/ James E. Cecchi_____
JAMES E. CECCHI

Dated: February 26, 2021

Warren T. Burns
Daniel H. Charest
Will Thompson
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002

Korey A. Nelson
Patrick D. Murphree
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, Louisiana 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

Adam J. Zapala
Elizabeth Castillo
**COTCHETT, PITRE &
McCARTHY, LLP**

Jonathan W Cuneo
Joel Davidow
Katherine Van Dyck
Daniel Cohen
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave, NW, Ste. 200
Washington, DC 20016
Telephone (202) 789-3960

Don Barrett
David McMullan
**BARRETT LAW GROUP, P.A.**
404 Court Square
P.O. Box 927
Lexington, Mississippi 39095
Telephone: (662) 834-2488

J. Manly Parks
**DUANE MORRIS LLP**
30 S 17th Street
Philadelphia, Pennsylvania 19103

24

San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Alexander E. Barnett
**COTCHETT, PITRE &**
**McCARTHY, LLP**
40 Worth Street
10th Floor
New York, New York 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753

Telephone (215) 979-1000
Facsimile (215) 979-1020

Exhibit A

**Memorandum of Understanding**
*In re Vehicle Carrier Services Antitrust Litigation,*
**MDL 2471, Master Docket No. 13-cv-3306**
**Now Pending in the U.S. District Court for the District of New Jersey**

This Memorandum of Understanding ("MOU"), made and effective as of July 23, 2015, subject to approval by K Line's Board of Directors, which is expected on or about July 31, 2015, sets forth the essential terms of the settlement (the "Settlement") agreed to by defendants Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., and their affiliates (collectively, "K Line") and End-Payor, Automobile Dealer, and Truck and Equipment Dealer Plaintiffs (collectively, "Indirect Purchaser Plaintiffs") in the above-referenced action (the "Action"):

1. By entering into this Settlement, K Line admits no liability to Indirect Purchaser Plaintiffs or the Classes (defined below). K Line maintains that it has meritorious defenses.

2. For purposes of effectuating the Settlement and releases contemplated by this MOU, K Line will consent to the certification of settlement classes (the "Classes") of Indirect Purchaser Plaintiffs in the indirect purchaser states, to be defined as alleged in each of their operative complaints. To effectuate the Settlement, K Line will also consent to the appointment of plaintiffs as settlement class representatives for each of the Classes and to the appointment of current interim co-lead counsel as Settlement Class Counsel for each of the Classes.

3. To settle all claims against K Line, as set forth below and more fully in the parties' anticipated settlement agreement, in the *In re Vehicle Carriers Antitrust Litigation*, by Indirect Purchaser Plaintiffs on behalf of themselves and the Classes, K Line will pay a total of USD ███████████ (the "Settlement Amount"). Within 30 days of the effective date of this MOU, K Line will deposit USD ████████ into interest bearing escrow accounts as directed by the Indirect Purchaser Plaintiffs.

4. The sum of ██████████ of the Settlement Amount shall be allocated to the End-Payor Plaintiffs and deposited into an escrow account at their direction.

5. The Automobile Dealer and Truck Dealer Plaintiffs shall divide the remaining ████████ by:

    a. Agreement, reflecting the dollar volume of commerce affected by the conspiracy with respect to the claims of their respective classes; or
    b. Arbitration, should the Automobile Dealer and Truck and Equipment Dealer Plaintiffs be unable to agree on the proper division.

6. From the escrow accounts, the following will be paid:

1

a. Upon the direction of Settlement Class Counsel, and prior to final approval by the Court of the Settlement, all costs of providing notice to the Classes and settlement fund administration will be paid out of the escrow account on a non-recoupable basis. Settlement Class Counsel shall attempt to defray the costs of notice by combining settlements if permitted by the Court to do so.

b. Attorneys' fees, costs and expenses and class plaintiff service awards awarded to Class Counsel and plaintiffs by the Court will be paid out of the escrow account. K Line will take no position on Class Counsel's application for attorneys' fees, costs and expenses or for service awards to the plaintiffs.

c. To authorized Class member claimants, Class Counsel shall have sole discretion to propose a plan of allocation to the Court, and no funds remaining in the escrow account shall revert to K Line. This is not a "claims made" settlement.

d. For the avoidance of doubt, none of the payments described above in Sections 6(b) or 6(c) shall be made until after the Effective Date of the Settlement. Further, if the court rejects the Settlement, the funds remaining in any escrow account shall revert to "K" Line.

7. Effective upon the finality of the Court's judgment granting final approval to the Settlement, plaintiffs and the Classes shall formally release K Line from claims they have asserted or may have asserted related to the sale of Vehicle Carrier Services in *In re Vehicle Carrier Services Antitrust Litigation* (including any potential antitrust or competition claims, any and all maritime claims, including claims arising under the Shipping act, etc.), subject to full opt-out rights and notice. Indirect Purchaser Plaintiffs' complaints against K Line will be dismissed with prejudice. Indirect Purchaser Plaintiffs and any Class member shall further agree not to file any lawsuit asserting such released claims. It is the parties' intent that any appeals shall not delay the use of funds.

8. Indirect Purchaser Plaintiffs will submit to the Court motions for preliminary approval of the Settlement. Indirect Purchaser Plaintiffs will prepare all documents in support of the settlement and will consult with counsel to K Line prior to filing. The "Effective Date" of the Settlement shall be the date that an order approving the Settlement has become a final and non-appealable order.

9. K Line will provide reasonable, satisfactory, and timely cooperation to Indirect Purchaser Plaintiffs and the Classes with respect to their continued prosecution of the Action against the remaining defendants, including but not limited to:

a. Furnishing all documents or other items given to U.S. government agencies in connection with vehicle carrier investigations that correspond to the claims in this Action;

b. Providing transaction data.

2

    c. Providing a full account of all facts known to K Line potentially relevant to the claims asserted in the Action; and

    d. Using K Line's reasonable best efforts to secure and facilitate cooperation from individuals and K Line's corporate representatives with knowledge or information relating to the claims asserted in the Action, and making them available for interviews, depositions, or testimony at trial as Indirect Purchaser Plaintiffs may reasonably require.

    e. For the avoidance of doubt, K Line's performance of its cooperation obligations under this Paragraph is subject to consultation with the U.S. Department of Justice to ensure that the cooperation is acceptable to the U.S. Department of Justice and not inconsistent with K Line's obligations under its plea agreement.

10. The parties expect to enter into a long-form settlement agreement providing further details regarding this MOU. The parties commit to enter into good faith negotiations to execute the long-form agreement, which they expect to supersede the terms of this MOU. However, the parties intend this MOU to be a binding agreement effective as of the date set forth above regardless of whether the long-form settlement agreement is ever executed and regardless of the occurrence of any decisions, developments or events materially adverse to plaintiffs, K Line, or any of the other parties in the Action.

11. The parties further agree that the long-form settlement shall contain a clause providing for the reduction of the Settlement Amount in the event the Indirect Purchaser Plaintiffs settle with any other defendant on more favorable monetary terms as measured by the agreed respective market shares. Indirect Purchaser Plaintiffs agree to inform "K" Line of any settlement with any other defendant, including the monetary terms of such settlement, for the purpose of determining whether the settlement is more favorable than the Settlement. "K" Line agrees to maintain the confidentiality of the fact and terms of any such information. Further, the clause shall cease to be binding in the event the court grants defendants' collective motion to dismiss the Indirect Purchaser Plaintiffs complaints, denies class certification, or grants summary judgment in favor of defendants resolving the plaintiffs' damages claims in their entirety in favor of defendants, and none of Indirect Purchaser Plaintiffs prevail on appeal on the relevant motion.

12. The parties further agree that the long-form settlement shall provide additional and sufficient detail regarding K Line's cooperation obligations.

13. Should Class Members accounting for more than fifteen percent (15%) of the purchasers of any of the three classes at issue opt-out of this Settlement, K Line shall be entitled to a reduction in the total Settlement Amount that the Class at issue would receive in accordance with this MOU measured by the difference between the percentage of Class members who opt out and fifteen percent (15%). For the avoidance of doubt, if twenty-five percent (25%) of a Class opts out, K Line would be

3

entitled to a ten percent (10%) reduction.  In the case of the automobile dealers and truck and equipment dealers, the number of purchasers shall be measured by number of physical dealerships ("rooftops").

14. Upon execution of this MOU by all signatories hereto, Indirect Purchaser Plaintiffs may inform the Court that they have reached an agreement in principle to settle this Action with K Line and request that the Court stay the proceedings.  The amount of the Settlement shall be held confidential until such time as Indirect Purchaser Plaintiffs and K Line have entered into a definitive settlement agreement.  However, Indirect Purchaser Plaintiffs may at any time inform the Court of the amount of the Settlement *in camera*.

15. The signatories to this MOU have been duly authorized to execute this MOU and make it binding upon the parties on whose behalf they are signing.  The parties recognize that the Settlement is subject to approval by "K" Line's Board of Directors.  Such approval is expected on or about July 31, 2015.

Dated: July 23, 2015.

KAWASAKI KISEN KAISHA, LTD.

By: _____ Jeremy Calsyn

Its: _Counsel_____


"K" LINE AMERICA, INC.

By: _____ Jeremy Calsyn

Its: _Counsel_____

4

INDIRECT PURCHASER PLAINTIFFS

END-PAYOR PLAINTIFFS

By: _____

Title:   Interim Co-Lead Counsel for the End-Payor Plaintiffs


AUTOMOBILE DEALER PLAINTIFFS

By: _____

Title:   Interim Co-Lead Counsel for the Automobile Dealer Plaintiffs


TRUCK AND EQUIPMENT DEALER PLAINTIFFS

By: _____

Title:   Interim Co-Lead Counsel for the Truck and Equipment Dealer Plaintiffs

# Exhibit B

**Letter Agreement Amending Memorandum of Understanding**
***In re Vehicle Carrier Services Antitrust Litigation,***
**MDL 2471, Master Docket No. 13-3306,**
**Now Pending in the U.S. District Court for the District of New Jersey**

This Letter Agreement, made and effective as of August 20, 2015, amends the Memorandum of Understanding ("MOU"), made and effective as of July 23, 2015, among defendants Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., and their affiliates (collectively, "K Line") and End-Payor, Automobile Dealer, and Truck and Equipment Dealer Plaintiffs (collectively, "Indirect Purchaser Plaintiffs") in the above-referenced action (the "action") as follows:

- Paragraph 3 of the MOU is hereby replaced with the following revised Paragraph 3:

  To settle all claims against K Line, as set forth below and more fully in the parties' anticipated settlement agreement, in the *In re Vehicle Carriers Antitrust Litigation*, by Indirect Purchaser Plaintiffs on behalf of themselves and the Classes, K Line will pay a total of USD ▮▮▮▮▮ (the "Settlement Amount"). Within 30 days of the effective date of this MOU, K Line will deposit USD ▮▮▮▮▮ into interest bearing escrow accounts as directed by the Indirect Purchaser Plaintiffs. Notwithstanding the thirty-day deposit deadline provided by this Paragraph 3, K Line shall have an additional ten (10) business days to complete the deposit of the Settlement Amount following the date on which counsel for the Indirect Purchaser Plaintiffs provide counsel for K Line with the necessary escrow account information (including, but not limited to, the account number, the SWIFT code, the name and address of the account holder, and the beneficiary/receiver for the escrow accounts of the End-Payor Plaintiffs, the Automobile Dealer Plaintiffs, and the Truck and Equipment Dealer Plaintiffs, respectively). For the avoidance of doubt, if the Indirect Purchaser Plaintiffs provide K Line with the necessary escrow account information on Monday, August 17, 2015, then K Line shall complete the deposit of the Settlement Amount into the respective escrow accounts on or before Monday, August 31, 2015.

Except as expressly provided herein, nothing in this Letter Agreement shall modify the terms or conditions of the MOU, or be construed as a waiver of any Party's rights or responsibilities under the MOU or otherwise.

The signatories to this Letter Agreement have been duly authorized to execute this Letter Agreement and make it binding upon the parties on whose behalf they are signing.

Dated: August 1̶3̶, 2015.

**KAWASAKI KISEN KAISHA, LTD.**

By: _____
     Jeremy J. Calsyn

Title:  Counsel

**"K" LINE AMERICA, INC.**

By: _____
     Jeremy J. Calsyn

Title:  Counsel

**INDIRECT PURCHASER PLAINTIFFS**

By: _____
     Warren T. Burns

Title:  Interim Co-Lead Counsel for the End-Payor Plaintiffs, and with permission of the Interim Co-Lead Counsel for the Automobile Dealership and Truck and Equipment Dealership Plaintiffs.

2

# Civil Case Information Statement

**Case Details: MERCER | Civil Part Docket# L-000431-21**

**Case Type:** CONTRACT/COMMERCIAL TRANSACTION

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Are sexual abuse claims alleged by: Jill Alban?** NO

**Are sexual abuse claims alleged by: Grant Alban?** NO

**Are sexual abuse claims alleged by: Mary Arnold?** NO

**Are sexual abuse claims alleged by: Al Baker?** NO

**Are sexual abuse claims alleged by: Katrina Bonar?** NO

**Are sexual abuse claims alleged by: Steven Bruzonsky?** NO

**Are sexual abuse claims alleged by: Monica Bushey?** NO

**Are sexual abuse claims alleged by: Melinda Deneau?** NO

**Are sexual abuse claims alleged by: Jennifer Dillon?** NO

**Are sexual abuse claims alleged by: Jeffrey L Gannon?** NO

**Are sexual abuse claims alleged by: Pamela Goessling?** NO

**Are sexual abuse claims alleged by: Thomas Goessling?** NO

**Are sexual abuse claims alleged by: Sheryl Haley?** NO

**Are sexual abuse claims alleged by: Leslie Hart?** NO

**Are sexual abuse claims alleged by: Bruce Hertz?** NO

**Case Caption:** ALBAN JILL  VS KAWASAKI KISEN KAISH A, LTD.

**Case Initiation Date:** 02/26/2021

**Attorney Name:** JAMES EDWARD CECCHI

**Firm Name:** CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO PC

**Address:** 5 BECKER FARM RD

ROSELAND NJ 070681738

**Phone:** 9739941700

**Name of Party:** PLAINTIFF : Alban, Jill

**Name of Defendant's Primary Insurance Company**

(if known): None

**Are sexual abuse claims alleged by: Maria Kooken? NO**

**Are sexual abuse claims alleged by: Kori Lehrkamp? NO**

**Are sexual abuse claims alleged by: Michael Lehrkamp? NO**

**Are sexual abuse claims alleged by: John Leva? NO**

**Are sexual abuse claims alleged by: Daniel Morris? NO**

**Are sexual abuse claims alleged by: Judy A Reiber? NO**

**Are sexual abuse claims alleged by: Richard Tomasko? NO**

**Are sexual abuse claims alleged by: John O'Neill Johnson Toyota? NO**

**Are sexual abuse claims alleged by: Rush Truck Centers of Arizona? NO**

---

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Business

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
  **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
  **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** YES  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

<u>02/26/2021</u>                                             <u>/s/ JAMES EDWARD CECCHI</u>
Dated                                                              Signed